1   WO

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                 **FOR THE DISTRICT OF ARIZONA**

8

9   Crystal Anne Plummer,              No. CV-13-08282-PCT-BSB

10              Plaintiff,             **ORDER**

11  v.

12  Carolyn W. Colvin, Acting Commissioner
    of Social Security,

13

14              Defendant.

15

16          Plaintiff Crystal Anne Plummer, proceeding pro se, seeks judicial review of the

17  final decision of the Commissioner of Social Security (the Commissioner) denying her

18  application for disability insurance benefits under the Social Security Act (the Act).  The

19  parties have consented to proceed before a United States Magistrate Judge pursuant to 28

20  U.S.C. § 636(b), and have filed briefs in accordance with Local Rule of Civil Procedure

21  16.1.  For the following reasons, the Court affirms the Commissioner's decision.

22  **I.     Procedural Background**

23          On May 18, 2010, Plaintiff applied for disability insurance benefits under Titles II

24  and XVI of the Act, alleging disability beginning May 8, 2007.  (Tr. 21.)[1]  After the

25  Social Security Administration (SSA) denied Plaintiff's initial application and her request

26  for reconsideration, she requested a hearing before an administrative law judge (ALJ).

27  After conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under

28

        _____

           [1] Citations to "Tr." are to the certified administrative transcript.  (Doc. 21.)

the Act.  (Tr. 21-28.)  This decision became the final decision of the Commissioner when the Social Security Administration Appeals Council denied Plaintiff's request for review. (Tr. 1-6.); *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals Council.)   Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

## II.   Medical Records and Opinion Evidence

The record before the Court establishes the following history of diagnosis and treatment related to Plaintiff's health.   The record also includes opinions from State Agency Physicians who examined Plaintiff and reviewed the records related to Plaintiff's impairments, but who did not provide treatment.

### A.   Treatment Records

In June 2007, Plaintiff sought treatment from Ron Ferguson, M.D., for right shoulder pain that she had experienced for a year.  (Tr. 263.)  Plaintiff reported that she injured her neck, right arm, and right shoulder in 2006 while lifting a patient in her job as a caregiver.  (Tr. 263, 282.)  Dr. Ferguson noted that a May 2007 MRI of Plaintiff's right shoulder showed some rotator cuff changes ("[m]oderate grade partial substance tear" of a tendon in her right shoulder), but opined that "her pathology [was] not in her rotator cuff."  (Tr. 263, 265.)  Dr. Ferguson order an MRI of Plaintiff's neck, which showed "minimal degenerative" changes in the mid-cervical spine.  (Tr. 262, 267.)  Dr. Ferguson prescribed non-steroidal anti-inflammatory medication (Celebrex) and physical therapy. (Tr. 262, 267-68.)  In September 2007, Plaintiff reported to Dr. Ferguson that medication and physical therapy did not help her symptoms.  (Tr. 261.)  On examination, Plaintiff had "mild tenderness" in her cervical spine and some "trapezial pain."  (*Id.*) Dr. Ferguson referred Plaintiff to Mitchell Major, M.D., for a "facet injection."  (Tr. 261, 256-60.)

During an October 8, 2007 appointment with Dr. Major, Plaintiff complained of constant neck and shoulder pain and increasing headaches.  (Tr. 256.)  On examination, Plaintiff had some tenderness in her neck and shoulders, but could move her shoulder and

1    upper arm in all directions and had full range of motion in her upper extremities.
2    (Tr. 257.)   She exhibited normal reflexes, coordination, and muscle strength.   (*Id.*)
3    Plaintiff's lower extremities and back were "within normal limits," and she had full
4    strength, normal reflexes, and coordination.   (*Id.*)   Dr. Major assessed right occipital
5    neuralgia headaches and administered occipital nerve injections to confirm the
6    diagnosis.[2]   (Tr. 256-60.)   After the injection, Plaintiff "denied any pain in her head or
7    neck."  (Tr. 259.)

8         The record reflects a gap in treatment until after Plaintiff had a baby in June 2008.
9    (Tr. 41, 288.)   In July 2008, Plaintiff saw primary care physician William H. Lawson,
10   M.D., complaining of headaches, which she reported experiencing for one year at a
11   frequency of three to four times per month.  (Tr. 293, 326.)  A July 29, 2008 CT scan of
12   Plaintiff's brain was "normal."  (Tr. 293, 326.)

13        In August 2008, Plaintiff saw neurologist Sam Hochane, M.D., complaining of
14   severe headaches three to four times a month and "some" pain in her right shoulder and
15   cervical spine.  (Tr. 333.)   On examination, Plaintiff had full muscle strength in all
16   extremities, normal muscle tone and bulk, normal reflexes, and a steady gait.  (Tr. 334.)
17   Dr. Hochane assessed possible migraine headaches and prescribed Maxalt.  (Tr. 333.)  He
18   instructed Plaintiff to follow up in two months.  (Tr. 333-34.)  In her reply, Plaintiff states
19   that she did not follow up with Dr. Hochane because he made her uncomfortable.
20   (Doc. 19 at 9.)

21        In January 2009, Plaintiff saw Dr. Lawson and complained of headaches, shoulder
22   pain, and back pain that radiated into her left leg.  (Tr. 325.)   She reported that her back
23   pain interfered with her sleep.  (*Id.*)  Dr. Lawson prescribed muscle relaxants and narcotic
24   pain medication and ordered an x-ray of Plaintiff's back.  (Tr. 325.)  In August 2009,

_____

26        [2]   Occipital neuralgia is a type of headache characterized by pain in the upper
27   neck, back of the head, and behind the ears.  The pain is caused by irritation of or injury
     to the occipital nerves.  A positive response (relief from pain) after an anesthetic nerve
28   block confirms the diagnosis.  *See* NINDS Occipital Neuralgia Information Page,
     http://www.ninds.nih.gov/disorders/occipitalneuralgia/occipitalneuralgia.html        (last
     visited December 16, 2014.)

Plaintiff returned to Dr. Lawson, complaining of continuing back and leg pain, but not headaches. (Tr. 303.) Plaintiff did not have an x-ray, as Dr. Lawson had ordered. (*Id.*) Dr. Lawson again ordered an x-ray of Plaintiff's lumbar spine. (*Id.*) An August 19, 2009 x-ray of Plaintiff's lumbar spine was "normal." (Tr. 303, 325.)

In September and October 2009, Plaintiff returned to Dr. Lawson for treatment of unrelated impairments (ear pain and an insect bite). (Tr. 324.) During the October 7, 2009 appointment, Plaintiff also reported radiating low back pain. (Tr. 324.) Dr. Lawson ordered an MRI of Plaintiff's lumbar spine back, which was "normal." (Tr. 304-05.) In December 2009, Plaintiff returned to Dr. Lawson's office for laboratory testing. (Tr. 323.)

In March 2010, Plaintiff saw Tariq Doorani, M.D., at Banner Baywood Neurology (Banner) and reported headaches, right-sided neck and shoulder pain, radiating neck pain, tingling in her hands, and difficulty sleeping. (Tr. 310-11.) Plaintiff reported that she was taking Vicodin, up to twice a day as needed. (*Id.*) On examination, Plaintiff had intact sensation in her arms and legs, symmetrical reflexes, normal muscle tone and strength in both her upper and lower extremities, and was able to "regular walk" and "tandem walk" without difficulty. (Tr. 311.) Plaintiff's neurological examination was "unremarkable." (*Id.*) Dr. Doorani prescribed nerve pain medication and ordered a nerve conduction study, which was normal. (Tr. 311, 364-69.)

In July 2010, Plaintiff saw Hamid Mortazavi, M.D., at Banner and reported continuing neck, shoulder, and back pain. (Tr. 309.) Plaintiff also reported that when she took Gabapentin, "the headache is gone." (*Id.*) On examination, Plaintiff had full strength in her upper and lower extremities, intact sensation bilaterally, and normal gait. (Tr. 309.) She also had pain in her neck with turning her head right or left, and had "mild pain" in her buttock area with "raised leg on right and left." (*Id.*) Dr. Mortazavi assessed osteoarthritis (cervical spondylosis) in Plaintiff's neck, increased her dose of Gabapentin, prescribed Zanaflex muscle relaxant at nighttime, and prescribed physical therapy for Plaintiff's neck pain. (*Id.*)

1    In August 2010, Plaintiff returned to Dr. Lawson complaining of low back and
2 shoulder pain. (Tr. 322.) She requested a TENS unit (transcutaneous electrical nerve
3 stimulation) for her back pain. (*Id.*) Dr. Lawson noted that Plaintiff's neck and shoulders
4 were tender on examination. (*Id.*) He renewed Plaintiff's pain medication and gave her a
5 TENS unit. (Tr. 322, 414.) In late August and early September 2010, Plaintiff returned
6 to Dr. Lawson and complained of pain in her back, left leg, and right shoulder. (Tr. 374.)
7 He referred her to physical therapy. (Tr. 374.)

8    During an initial assessment for physical therapy, Plaintiff complained of back
9 pain radiating into her left leg, neck pain radiating into her right shoulder, and tingling in
10 her hands. (Tr. 384.) She said that she still had headaches, "but not like before." (*Id.*)
11 The treatment note indicates that Plaintiff had decreased weight bearing on the left side,
12 was unable to sit or stand for very long, and shifted her weight often. (Tr. 384.)

13    On referral from Dr. Lawson, in November 2010, Plaintiff saw Ian Brimhall, D.O.,
14 for evaluation of her neck, shoulder, and low back pain. (Tr. 359.) Plaintiff complained
15 of right shoulder pain, tingling in her hands, radiating low back pain, difficulty sleeping,
16 difficulty sitting or standing for long periods, and occasional numbness in her left leg or
17 foot. (Tr. 359-60.) Although Plaintiff had a "long history of headaches," she "denie[d]
18 any recent headaches." (Tr. 360.) On examination, Plaintiff's right shoulder was
19 "asymptomatic." (Tr. 359-60.) She had a normal stride and heel-to-toe stance, she could
20 regular walk and tandem walk, she had good strength in her right shoulder, her "neck
21 range of motion passively [was] full in both flexion, extension, rotation, and side bending
22 [were] symmetric." (Tr. 360.) Plaintiff complained of some pain in her cervical spine
23 and trapezius with forced flexion, she also had tenderness in her lower lumbar spine with
24 palpation, and had "sciatica symptoms" on the left side (positive straight leg raising).
25 (Tr. 360.) Dr. Brimhall ordered an MRI of Plaintiff's lumbar spine. (*Id.*)

26    Plaintiff saw Dr. Brimhall on November 17, 2010 for a follow-up for her
27 continuing complaints of lumbar pain. (Tr. 379.) Plaintiff's "exam was essentially
28 unchanged" from her previous visit. (*Id.*) Dr. Brimhall reviewed the November 8, 2010

MRI and found that Plaintiff had mild disc degeneration at L3-L4 and L4-5, and a "cyst on the lateral nerve root in the left facet of L3-L4" that could cause radiculopathy. (Tr. 362-63, 379.) Dr. Brimhall recommended a surgical consultation based on Plaintiff's increased symptomology. (Tr. 379.)

On referral from Dr. Brimhall, in January 2011, Plaintiff saw Dr. Donald Hales and Physician Assistant (PA) John Taylor at Northern Arizona Orthopedics. (Tr. 396-401.) Plaintiff complained of "longstanding" right shoulder and arm pain, neck pain, back pain, and headaches. (*Id.*) Plaintiff reported that Neurontin gave her "significant relief" and had "decreased her headaches significantly." (Tr. 400, 401.) Plaintiff reported that she was reluctant to take prescribed pain medication or muscle relaxants because they made her drowsy and, as the mother of four children, she needed to be alert to care for them. (Tr. 397.)

On examination, Plaintiff had "no abnormal gait patterns," an "appropriate . . . for age" range of motion in her neck on flexion, extension, and rotation, and normal strength in her head and neck. (Tr. 398.) Plaintiff had a limited range of motion in her spine and pelvis "secondary to pain complaints," but was "able to rise from sit to stand and ambulate without difficulty" and had normal strength in her spine and pelvis. (Tr. 398-99.) Plaintiff had a full range of motion in her right elbow and wrist, a limited range of motion in her right shoulder "secondary to pain," and normal strength in her right hand, wrist, and elbow. (Tr. 399.) Dr. Hales and PA Taylor were unable to accurately test right shoulder strength due to complaints of pain. (*Id.*) Plaintiff's left upper extremity had full range of motion and normal strength. (*Id.*) Plaintiff's right lower extremity had no evidence of atrophy, full range of motion, and full strength. (*Id.*) Plaintiff's left lower extremity had no evidence of atrophy, full range of motion, and full strength. (Tr. 399-400.) A neurological examination was normal (including normal sensation and reflexes). (*Id.* at 400.) Plaintiff had tenderness on the right side of her lumbar spine, but no tenderness over the sciatic notch or the piriformis muscle. (*Id.*) Dr. Hales and PA Taylor found "no evidence of radicular symptoms in either lower extremity as well as [no]

symptoms of sciatica or piriformis syndrome." (Tr. 401.)  They assessed musculoskeletal back pain and recommended physical therapy and "other conservative treatment" including chiropractic care, massage, and a walking program to "keep [Plaintiff's] fitness level from decreasing anymore." (Tr. 401.)

Plaintiff returned to Dr. Brimhall in February 2011 complaining of pain down her arm, burning around her right shoulder, and constant pain in her neck that radiated to her head. (Tr. 405.)  On examination, Plaintiff had tenderness along her "mid cervical spine central." (*Id.*)  Her active range of motion in her neck was limited to fifty degrees of rotation. (*Id.*)  She also had tenderness along the "left paraspinal musculature" and the right trapezius. (*Id.*)  Plaintiff had reduced strength in her right shoulder, full range of motion in her wrist and elbow, and a somewhat limited range of motion of her right shoulder.

During a March 2011 appointment with Dr. Brimhall, Plaintiff complained of constant neck pain, headaches, and pain radiating down her leg. (Tr. 404-05.)  She also indicated that Neurontin was not effectively controlling her headaches. (Tr. 404.)  On examination, Plaintiff had some tenderness on her right trapezius and shoulder.  She had good rotator cuff strength. (*Id.*)  Dr. Brimhall ordered an updated MRI of Plaintiff's neck, which showed "relatively minimal" degenerative changes. (Tr. 404-05, 415-16.)  Dr. Brimhall administered a corticosteroid injection in Plaintiff's right shoulder and scheduled a lumbar injection for Plaintiff's back. (*Id.*)

In June 2011, Plaintiff returned to Dr. Brimhall and complained that her back symptoms had flared up following a recent hysterectomy. (Tr. 403.)  She reported difficulty "getting around" and increased radicular symptoms down her left leg and numbness around the back of her buttock. (Tr. 403.)  On examination, Plaintiff had "some" tenderness along her lower lumbar spine and a positive straight leg test on the left. (*Id.*)  Her reflexes were symmetric and normal, her sensation and motor examination were normal, she had good strength with hip flexion, knee flexion, dorsiflexion, and plantarflexion of the ankles. (*Id.*)     Dr. Brimhall recommended epidural steroid

1   injections.  (*Id.*)  He found that Plaintiff's headaches were "currently controlled" with

2   medication that Dr. Lawson was prescribing.  (*Id.*)

3       Between December 2010 and October 2011, Plaintiff continued to receive

4   treatment from Dr. Lawson, primarily in the form of "med[ication] renewal."  (Tr. 408-

5   13.)  Dr. Lawson's treatment notes contain few examination findings, but note that

6   Plaintiff regularly reported shoulder and low back pain.  (Tr. 408-13.)  In March and

7   April 2011, Dr. Lawson noted that Plaintiff reported headaches and that she had become

8   "intolerant" to Gabapentin, which caused some dizziness.  (Tr. 410-11, 413.)

9       On referral from Dr. Lawson, on October 29, 2011, Plaintiff saw Panna Shah,

10  M.D. at Flagstaff Neurology.[3]  (Tr. 424.)  Plaintiff complained of pain in her right

11  shoulder that was worse with lifting, pain in her neck, and pain in her leg.  (*Id.*)  She also

12  reported "extremely bad" headaches that occurred "daily or two to four times a week

13  without nausea, vomiting, photophobia, or sonophobia." (*Id.*)  On examination, Dr. Shah

14  observed that Plaintiff appeared "fine at times" and "at times tense[ed] up her shoulder

15  and neck muscles."  (*Id.*)  Plaintiff's neck was supple, she had normal muscle tone, bulk,

16  and strength, she had a normal sensory examination, her gait and tandem walk were

17  normal, and her extremities were "without edema."  (Tr. 425.)  After examining Plaintiff

18  and reviewing MRIs of her brain, neck, and back, Dr. Shah found "nothing to explain

19  [Plaintiff's] pain."  (Tr. 425.)  Dr. Shah recommended an increased dose of nerve pain

20  medication and prescribed Remeron for depression related to Plaintiff's headaches.

21  (Tr. 423-25.)  Dr. Shah assessed Plaintiff with "chronic headaches, common migraines."

22  (Tr. 425.)

23      **B.    Medical Opinion Evidence**

24          **1.    Dr. Lawson**

25      On October 23, 2011, Dr. Lawson completed a "Physical Capacities Evaluation."

26  (Tr. 421-22.)   He opined that, in an eight-hour day, Plaintiff could lift ten pounds

27  ───────────────

28      [3]  Plaintiff continued to see Dr. Lawson between late October 2011 and March 2012, mainly for impairments that are not at issue in this case (abdominal pain and gynecological issues).  (Tr. 426-27.)

occasionally and five pounds frequently, sit for four hours, stand for two hours, and walk for two hours.  (Tr. 421.)  He also opined that Plaintiff had "moderately severe" pain and fatigue that would likely result in being off task thirty to fifty percent of the time.  (Tr. 421-22.)  Dr. Lawson stated that these limitations had been present since February 2007.  (Tr. 421-22.)

In June 2012, Dr. Lawson completed a second "Physical Capacities Evaluation."  (Tr. 434-35.)  Dr. Lawson opined that, in an eight-hour day, Plaintiff was limited to sitting, standing, and walking one hour each, and that she had "severe" pain that was likely to result in her being off task more than fifty percent of the time.  (Tr. 435.)  Dr. Lawson opined that these limitations had been present for seven years.  He did not explain the change in his opinion since October 2011.  (*Compare* Tr. 421-22 *with* Tr. 434-35.)

### 2. Joseph Ring, D.O.

In September 2010, state agency physician Dr. Ring evaluated Plaintiff for her disability benefits claim.  (Tr. 351.)  Plaintiff complained of headaches and pain in her back, left leg, and right shoulder.  (*Id.*)  She reported that the headaches were "pretty intense" and made it "hard for her to do day-to-day chores."  (*Id.*)  Plaintiff said that her primary problem was that she could not do her past work as a caretaker (which involved lifting patients), "[b]ut as far as her day-to-day chores, she [did] not have any significant problem with them."  (*Id.*)  In particular, Plaintiff reported that she could cook, clean, go to the store, carry groceries, and "do anything that she really needs to do on a day-to-day basis." (Tr. 351.)

Dr. Ring observed that Plaintiff was able to sit reasonably comfortably (with some shifting), walk to the exam table, and get on and off the table comfortably.  (Tr. 352.)  Straight leg raising was positive and she had reduced range of motion in her neck.  (Tr. 353.)  She had normal range of motion in her back and shoulders, intact sensation and reflexes, normal muscle strength, bulk, and tone, and a normal gait.  (Tr. 353.)  Dr. Ring diagnosed cervical spondylosis, which he opined was likely the cause of her

1    reported neck and shoulder pain.  (*Id.*)  He could not identify a "specific cause" for
2    Plaintiff's reported low back pain, but "suspect[ed]" degenerative disc disease in her
3    lumbar spine.  (*Id.*)  Dr. Ring opined that Plaintiff had abilities consistent with light work.
4    (Tr. 352-56.)

5           In January 2011, Plaintiff returned to Dr. Ring for a second examination for her
6    disability benefits claim.  (Tr. 389.)  Plaintiff reported significant right shoulder pain, but
7    said that nerve pain medication helped her headaches.  (*Id.*)  Dr. Ring noted that
8    Plaintiff's left leg pain had resolved and did not seem to be "much of an issue" and that
9    Plaintiff had an improved range of motion in her neck.  (*Id.*)  He reaffirmed his prior
10   diagnoses, but found some improvement in Plaintiff's condition.  (Tr. 389.)  He opined
11   that Plaintiff had abilities consistent with medium work.   (Tr. 389-95); *see* 20
12   C.F.R. §404.1567(c) (defining medium work).

13                  **3.      Jean Goerrs, M.D.**

14          In late September 2010, state agency physician Dr. Goerrs reviewed the record and
15   found that Plaintiff had abilities consistent with light work.   (Tr. 57-59); *see*
16   C.F.R. § 404.1567(b) (defining light work).

17                  **4.      Ernest Griffith, M.D.**

18          In February 2011, state agency physician Ernest Griffith, M.D., reviewed the
19   record and opined that Plaintiff had abilities consistent with light work.  (Tr. 81-83.)  He
20   opined that any limitations resulting from Plaintiff's headaches could be addressed by
21   avoiding concentrated exposure to noise and vibration.  (Tr. 82-83.)

22          **C.     Plaintiff's Statements**

23          In July 2010, Plaintiff completed a questionnaire about her headaches for her
24   claim for disability insurance benefits.   (Tr. 224-25.)   Plaintiff reported that she
25   experienced headaches at least once a week, which lasted for one or two days at a time
26   and progressed until she vomited and passed out.  (Tr. 224-25.)  Although Plaintiff had
27   recently told a care provider that her headaches resolved with pain medication (Tr. 309

28

(headaches "gone" with Gabapentin)), she asserted that, with medication, the headaches "still hurt but [she didn't] pass out."  (Tr. 225.)

Plaintiff also completed a questionnaire about her activities for her claim for disability insurance benefits.  (Tr. 213-15.)  Plaintiff reported that she tried to avoid lifting anything over five pounds and that, when she got a headache, she did not do anything but lie on the couch.  (Tr. 213-14.)  Plaintiff also reported that she cooked, cleaned, did laundry, cared for her children, drove, and shopped for groceries.  (Tr. 213-14.)

In November 2011, Plaintiff completed a second headache questionnaire for her claim for benefits.  (Tr. 234-35.)  Plaintiff asserted that her headaches had increased from once a week to three or four times a week, and that nothing relieved them.  (Tr. 234-35.)

### III.   Administrative Hearing Testimony

Plaintiff was represented by counsel and testified at the administrative hearing. She was in her early thirties on her date last insured and at the time of the hearing.[4] (Tr. 38.)  Plaintiff had a high school education and had past relevant work as a caregiver and a certified nurse's assistant (CNA).  (Tr. 39, 204, 216.)

Plaintiff lived with her husband and their four children (ages four, nine, eleven, and fifteen).  (Tr. 41.)  Plaintiff testified that she could walk for about twenty minutes, sit for about twenty minutes, and lift "a gallon of milk."  (Tr. 44.)  She also testified that she had constant pain in her back that radiated to her big toe and that her shoulder, "[felt] like tugging," and "like it burn[ed]."  (*Id.*)  Plaintiff denied grocery shopping, but admitted that she cared for her four-year-old child while her husband was at work, handled her own self-care, cooked, washed dishes, did laundry, gardened, and drove.  (Tr. 41-43.)

During the administrative hearing, the ALJ asked Plaintiff whether, after stopping work, she applied for unemployment benefits.  (Tr. 40.)  Plaintiff stated that she could not remember "if [she] did or not," but stated that she was "sure [she] did because [she]

---

[4]  To qualify for disability insurance benefits, a claimant must establish disability on or before her date last insured.  20 C.F.R. § 404.315; *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

1   needed the medical." (*Id.*)  The ALJ responded, "pardon?" and Plaintiff replied that she

2   was "sure [she] did.  [She] needed the medical." (*Id.*)  The ALJ gave Plaintiff's counsel

3   the opportunity to ask Plaintiff questions but he declined, stating "I think you asked my

4   questions, Judge." (Tr. 45.)  At the end of the hearing, the ALJ asked Plaintiff's counsel

5   if he had anything else to add to the proceedings. (Tr. 48.)  Plaintiff's counsel responded

6   "No, Your Honor." (Tr. 48.)

7       Vocational expert Tom Mitchell also testified at the hearing.  He repsonded to a

8   series of hypothetical questions, one of which concerned (i) an individual of Plaintiff's

9   age, education, and work experience, (ii) who, in an eight-hour day, could sit, stand, and

10  walk for six hours each, frequently lift and carry ten pounds, occasionally lift and carry

11  twenty pounds, occasionally climb, balance, stoop, kneel, crouch, and crawl, and

12  (iii) must avoid concentrated exposure to noise and vibration. (Tr. 46-47.)  The expert

13  testified that the hypothetical individual could not perform Plaintiff's past work, but

14  could do other work that exists in significant numbers in the national economy, including

15  the unskilled light jobs of cashier, food preparation worker, and housekeeper. (Tr. 46,

16  47-48.)

17  **IV.   The ALJ's Decision**

18      A claimant is considered disabled under the Social Security Act if she is unable

19  "to engage in any substantial gainful activity by reason of any medically determinable

20  physical or mental impairment which can be expected to result in death or which has

21  lasted or can be expected to last for a continuous period of not less than 12 months."

22  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard

23  for supplemental security income disability insurance benefits).  To determine whether a

24  claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20

25  C.F.R. §§ 404.1520, 416.920.

26      **A.   Five-Step Evaluation Process**

27      In the first two steps, a claimant seeking disability benefits must initially

28  demonstrate (1) that she is not presently engaged in a substantial gainful activity, and

(2) that her disability is severe.  20 C.F.R. § 404.1520(a)-(c).  If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three through five.  At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's residual functional capacity (RFC).  At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

**B.     The ALJ's Application of the Five-Step Evaluation Process**

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period.  (Tr. 23.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease, cervical spondylosis, right shoulder impingement, [and] headaches (20 C.F.R.  § 404.1520(c) and 416.920(c))."  (*Id.*)  At the third step, the ALJ found that the severity of Plaintiff's impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 24.)  The ALJ next concluded that Plaintiff retained the RFC to perform "light work as defined in 20 C.F.R. § 404.1567(b) and 404.416.967(b) except [she was limited to] sitting, standing or walking for six hours out of an [eight]-hour workday."  (Tr. 24.)  The ALJ also found Plaintiff limited to occasional climbing and balancing, stooping, kneeling, crouching, or crawling.  (Tr. 24.)  The ALJ further found that Plaintiff "should avoid concentrated exposure to noise and vibration."  (*Id.*)  At step four, the ALJ concluded that Plaintiff could not perform her past relevant work.  (Tr. 26.)   However, the ALJ

1    concluded that "considering Plaintiff's age, education, work experience, and residual

2    functional capacity, there [were] jobs that exist in significant numbers in the national

3    economy that [Plaintiff could] perform."  (*Id.*)  Thus, the ALJ determined that Plaintiff

4    had not been under a disability, as defined in the Act, from May 8, 2007 through the date

5    of the September 14, 2012 decision.  (Tr. 28.)

6    **V.    Standard of Review**

7          The district court has the "power to enter, upon the pleadings and transcript of

8    record, a judgment affirming, modifying, or reversing the decision of the Commissioner,

9    with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district

10   court reviews the Commissioner's final decision under the substantial evidence standard

11   and must affirm the Commissioner's decision if it is supported by substantial evidence

12   and it is free from legal error.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198

13   (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ

14   erred, however, "[a] decision of the ALJ will not be reversed for errors that are

15   harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

16         Substantial evidence means more than a scintilla, but less than a preponderance; it

17   is "such relevant evidence as a reasonable mind might accept as adequate to support a

18   conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see*

19   *also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In determining whether

20   substantial evidence supports a decision, the court considers the record as a whole and

21   "may not affirm simply by isolating a specific quantum of supporting evidence."  *Orn v.*

22   *Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted).

23         The ALJ is responsible for resolving conflicts in testimony, determining

24   credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

25   Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational

26   interpretation, [the court] must defer to the ALJ's conclusion."  *Batson v. Comm'r of Soc.*

27   *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

28

1    **VI.    Plaintiff's Claims**

2        Plaintiff argues that the Court should remand this matter to the Commissioner for

3    an award of benefits.   To support her claim that she is entitled to disability insurance

4    benefits, Plaintiff asserts that the ALJ erred by failing to consider Plaintiff's headaches a

5    listed impairment under 20 C.F.R. pt. 404, subpt. P. App'x 1.   (Doc. 14 at 2.)   Plaintiff

6    also argues that the ALJ erred by discounting her symptom testimony and the opinions of

7    Dr. Lawson.   (Doc. 14 at 1-2.)   Plaintiff also asserts that the Court should consider a letter

8    from the Department of Economic Security (DES) that she filed in this Court, but that she

9    did not submit to the ALJ or to the Appeals Counsel.   (*Id.* at 18; Doc. 16.)   In response,

10   the Commissioner argues that the ALJ's decision is free from legal error and is supported

11   by substantial evidence in the record, and that the Court should not consider Plaintiff's

12   new evidence.   (Doc. 15.)   As set forth below, the Court finds that substantial evidence

13   supports the ALJ's disability determination and that the ALJ did not commit harmful

14   error.

15       **A.    Consideration of Listing 11.03 at Step Three**

16       Plaintiff argues that the ALJ erred by failing to consider Listing 11.03 at step three

17   of the sequential evaluation process to determine whether Plaintiff's headaches met or

18   equaled that listed impairment.   (Doc. 14 at 7-8, 25-26.)   At step three, the ALJ

19   determines whether a claimant's impairment meets or equals an impairment listed in

20   Appendix 1 to Subpart P of Regulations No. 4.   However, an ALJ is not required to

21   conduct an equivalency determination unless the claimant presents evidence to establish

22   equivalence.   *See Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001) (determining that the

23   ALJ's failure to consider equivalence was not reversible error because the claimant did

24   not offer any theory, plausible or otherwise, as to how his impairments combined to equal

25   a listing impairment).

26       The Social Security Regulations "Listing of Impairments" consists of impairments

27   to fifteen categories of bodily systems or disorders that are severe enough to preclude a

28   person from performing gainful activity.   *Young v. Sullivan*, 911 F.2d 180, 183-84 (9th

Cir. 1990); 20 C.F.R. § 404.1520(d).  If a claimant's impairment meets or equals a listed impairment she will be found disabled at this step without further inquiry.  20 C.F.R. § 404.1520(d)).  The Listing of Impairments describes each impairment including the symptoms, signs, and laboratory findings that make up the characteristics of each listed impairment.  *See* 20 C.F.R. § 404.1525.  For a claimant's impairment or combination of impairments to meet the requirements of a listed impairment, all of the criteria of that listing and the duration requirement must be satisfied.  *See Key v. Heckler*, 754 F.2d 1545, 1550 (9th Cir. 1985); 20 C.F.R. §§ 404.1525(c)(1-3), 416.925(c)(1-3).  Medical equivalence will be found "if the medical findings are at least equal in severity and duration to the listed findings."  20 C.F.R. § 404.1526(a); *see Marcia v. Sullivan*, 900 F.2d 172, 175 (9th Cir. 1990).

According to the SSA's Questions and Answers 09-036 (Q & A), Listing 11.03 "Epilepsy-nonconvulsive epilepsy"[5] is "the most analogous listing for considering medical equivalence [of migraine headaches]."  *See Miller v. Astrue*, 2011 WL 671752, at *12 (D. Ariz. Feb. 17, 2011) (citing Q & A 09-036).  "The Q & A describes the essential components of Listing 11.03, as [they] apply to migraine headaches: typical headache event pattern that is documented by detailed descriptions, including all associated phenomena (e.g., premonitory symptoms, aura, duration, intensity, treatment), that occurs more frequently than once weekly with alteration of awareness or an effect that significantly interferes with activity during the day (e.g., need for a darkened quiet room, lying down without moving, or sleep disturbance that impacts daytime activities)."  *Miller*, 2011 WL 671752, at *12 (citing Q & A 09-036).

---

[5] Listing 11.03 of the SSA's Listing of Impairments describes epilepsy and states:

> Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.  With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.  20 C.F.R. Pt. 404, Subpt. P, App'x 1.

- 16 -

The Commissioner argues that Plaintiff has not met her burden of presenting medical findings satisfying all the criteria of Listing 11.03 over twelve months because the record reflects that Plaintiff's headaches responded to medication.  (Doc. 15 at 18 n.9 (citing Tr. 309, 384, 403).)   Plaintiff disagrees and argues that medication did not eliminate her headaches.  (Doc. 19 at 5-6.)

The record contains evidence that Plaintiff experienced headaches with varying frequency for over twelve months.  (Tr. 293, 224, 424.)   The record also reflects that Plaintiff's headaches were controlled by medication on numerous occasions.  (Tr. 259 (Plaintiff denied pain in her head after a "right nuchal ridge injection), Tr. 333 (shots in Plaintiff's neck relieved headaches for a couple of months), Tr. 309 (Plaintiff's headaches were "gone" when she took Gabapentin), Tr. 384 (Plaintiff experienced headaches, but "not like before"), Tr. 360 (Plaintiff "denied any recent headaches"); Tr. 397 ("Neurontin 3 mg 4 times a day has significantly relieved [Plaintiff's] headaches"); Tr. 403 (headaches "controlled by Dr. Lawson with current prescriptions").)

The record reflects that in March and April 2011 Plaintiff was "intolerant" to Gabapentin (also known under the trade name Neurontin) and that it did not effectively control her headaches at that time.  (Tr 404, 411-413.)   However, by June 27, 2011, Dr. Lawson had "controlled" Plaintiff's headaches with medication.  (Tr. 403.)   In October 2011, Dr. Shah increased Plaintiff's dose of Neurontin, which suggests that Plaintiff was tolerating Neurontin at that point.  (Tr. 425.)   On the whole, the record indicates that Plaintiff's headaches were not intractable during the relevant time period.[6] *See Warre v. Comm'r of Soc. Sec. Admin*., 439 F.3d 1001, 1006 (9th Cir. 2006)

---

[6]   Plaintiff also fails to meet or equal Listing 11.03 because the record contains few detailed reports of Plaintiff's headaches.  *See Miller*, 2011 WL 671752, at *12. Questionnaires that Plaintiff completed in 2010 to support her application for disability benefits indicate that headaches made Plaintiff vomit and pass out and required her to lie down until they passed.  (Tr. 213-14, 224-25, 234-35.)  However, with the exception of an August 11, 2008 treatment record noting that Plaintiff had nausea and occasional vomiting associated with her headaches (Tr. 303), the treatment notes do not include detailed descriptions of Plaintiff's headaches and one treatment note indicates that Plaintiff did *not* have "nausea, vomiting, photophobia, or sonophobia" associated with her headaches.  *See Miller*, 2011 WL 671752, at *12 (noting that to equal Listing 11.03the record must include "detailed descriptions" of the claimant's headaches).

(impairments controlled effectively with medications are not disabling); *Mallett v. Astrue*, 2013 WL 121469, at *4 (D. Or. Jan. 7, 2013) (the ALJ's determination that the claimant's headaches did not meet or equal Listing 11.03 was supported by substantial evidence when the record reflected that the headaches responded to medication).   Accordingly, even if the ALJ erred in failing to consider whether Plaintiff's headaches met or equaled Listing 11.03, that error was harmless.

Plaintiff further asserts that the ALJ erred by assessing an RFC that did not account for limitations resulting from Plaintiff's headaches.   (Doc. 14 at 12-13.) However, as discussed above, the record reflects that Plaintiff's headaches responded to medication, thus, the ALJ did not need to account for headaches in the RFC.  (Tr. 25, 309, 384, 403).  Moreover, the ALJ assessed an RFC that took Plaintiff's headaches into account by adopting a state agency physician's opinion that, due to her headaches, Plaintiff should avoid concentrated exposure to noise and vibration.  (*Compare* Tr. 24 *with* Tr. 82-83.)  Accordingly, the ALJ did not err in this regard.

## B.    Medical Source Opinion Evidence

Plaintiff also argues that the ALJ erred in her assessment of the medical source opinion evidence.  In weighing medical source evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, more weight is given to a treating physician's opinion.  *Id.*   The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion.  *Id.*; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject a controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.  The Court

1    considers Plaintiff's claims regarding the weight the ALJ assigned to the medical source

2    opinions in light of these standards.

3    **1.      Weight Assigned Dr. Lawson's Opinions**

4        In October 2011, Dr. Lawson opined that, in an eight-hour day, Plaintiff could sit

5    for a total of four hours, stand for a total of two hours per day, and walk for a total of two

6    hours per day.  (Tr. 421.)  He also opined that Plaintiff could frequently lift up to five

7    pounds and occasionally lift up to ten pounds.  (*Id.*)  He also found that she could

8    occasionally bend, but could never squat, climb, crawl, or reach.  (*Id.*)  He also opined

9    that Plaintiff had moderately severe pain and fatigue.  (Tr. 422.)  He explained that, since

10   2007, Plaintiff had not responded to treatment, including muscle relaxants, steroid

11   injections, and pain medication for her low back pain, shoulder pain, headaches, and

12   "possible fibromyalgia."  (*Id.*)

13       In June 2012, Dr. Lawson opined that Plaintiff could sit, stand, or walk for a total

14   of one hour in an eight hour day.  (Tr. 434.)  He also opined that she could lift up to ten

15   pounds occasionally and carry up to five pounds occasionally.  (*Id.*)  He found that

16   Plaintiff could occasionally bend, squat, crawl, climb, and reach.  (*Id.*)  He opined that

17   Plaintiff had severe pain and moderately severe fatigue.  (Tr. 435.)  He noted that, for the

18   previous seven years, Plaintiff had not found any relief for her migraines, cervical

19   radiculopathy, and right shoulder pain despite "numerous neurologic consults."

20   (Tr. 435.)

21       The ALJ gave Dr. Lawson's opinions "[n]o weight" because the objective findings

22   in the record did not support the level of impairment that Dr. Lawson found.  (Tr. 26.)

23   Plaintiff challenges this basis for the ALJ's assessment of Dr. Lawson's opinion.[7]

24   (Doc. 14 at 2.)  The ALJ did not err by rejecting Dr. Lawson's opinions as unsupported

25   _____

26       [7] The ALJ also discounted Dr. Lawson's opinions because they were inconsistent
     with Plaintiff's conservative course of treatment and they were dated after the claimant's
27   date last insured.  (Tr. 26.)  Plaintiff does not challenge these grounds for the ALJ's
     assessment of Dr. Lawson's opinion.   (Doc. 14.)   However, the Court notes that
28   Dr. Lawson stated that his 2011 opinion covered the period from February 2007 to the
     date of that opinion (Tr. 422), and that his June 4, 2012 opinion was based on his
     treatment of Plaintiff for the previous seven years.  (Tr. 435.)

by the medical record because "the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray v. Comm'r of Soc. Sec. Admin*., 554 F.3d 1219, 1138 (9th Cir. 2009); *Batson v. Comm'r of the Soc. Sec. Admin*., 359 F.3d 1190, 1195 (9th Cir. 2004) (an ALJ may discount treating physician opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings).

Substantial evidence in the record supports the ALJ's determination that the medical record does not support the limitations that Dr. Lawson identified. The diagnostic tests reflect mostly normal findings. A 2007 MRI reflects that Plaintiff had a "moderate grade partial substance tear" in a tendon in her right shoulder. (Tr. 263, 265.) A 2008 CT scan of Plaintiff's head was normal. (Tr. 293, 326.) A 2009 x-ray of Plaintiff's lumbar spine was normal. (Tr. 303 (finding that "vertebral height is well maintained. Invertebral disc space is well maintained" "normal lumber spine"), Tr. 325.) A November 2009 MRI of Plaintiff's back was normal and, although a November 2010 MRI showed a cyst lateral to a nerve root that could cause radiculopathy, specialist Dr. Hales found no evidence of radicular symptoms in either leg. (Tr. 25; *see* Tr. 304-05, 362-63, 401.)

MRIs of Plaintiff's neck showed only minimal degenerative changes, nerve conduction studies were normal, and specialist Dr. Shah found no objective basis to explain Plaintiff's reported neck pain. (Tr. 25-26, 262, 267-68, 364-69, 415-16, 425.) Additionally, the record reflects that Plaintiff's headaches responded to treatment. (Tr. 25; *see* Tr. 309, 384, 403). This evidence supports the ALJ's conclusion that the record did not support the extreme limitations that Dr. Lawson identified.

Dr. Lawson's treatment notes record Plaintiff's subjective complaints and include few examination findings. (Tr. 322, 324, 325, 326, 374, 408-13, 410-13.) His examination notes reflect that Plaintiff's range of motion was "ok" (326), she had pain on "rom" (Tr. 325), she had tenderness in her shoulder, (322, 326, 326), tenderness in her neck (Tr. 322), and tenderness in her elbow. (Tr. 412.) While Dr. Lawson's treatment

notes contain some evidence of Plaintiff's pain or limitations, the ALJ rationally concluded that these treatment records and the medical record did not support the limitations he identified.  The Court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation."  *Magallanes*, 881 F.2d at 750; *see Batson*, 359 F.3d at 1198.  Accordingly, the Court finds that ALJ did not err in rejecting Dr. Lawson's opinions and that substantial evidence supports that determination.

### 2.    Weight Assigned Dr. Ring's Opinions

Plaintiff also appears to argue that the ALJ erred by giving great weight to the opinions of examining physician Dr. Ring.  (Doc. 14 at 19-20.)  The Ninth Circuit has held that the opinion of an examining or reviewing physician may constitute substantial evidence in support of an ALJ's decision when it is consistent with independent clinical findings or other evidence of record.  *See Thomas*, 278 F.3d at 957.

Dr. Ring examined Plaintiff in September 2010 and January 2011.  (Tr. 351-556, Tr. 389-95.)  In 2010, Dr. Ring opined that Plaintiff had abilities consistent with light work.  (Tr. 354-46.)  In 2011, he opined that Plaintiff had abilities consistent with medium work.  (Tr. 389-95.)  Both of Dr. Ring's opinions are supported by detailed examination findings, and he explained his 2011 opinion by noting that Plaintiff's condition improved between his first examination in September 2010 and his second examination in January 2011.  (Tr. 352-54, 390-91.)

The ALJ reasonably gave great weight to Dr. Ring's opinions because they were consistent with the record and supported by Dr. Ring's independent clinical findings.[8] (Tr. 25-26.)  As previously stated, the objective medical tests in the record contain mostly normal findings that support the limitations that Dr. Ring assessed.  (*See* Section VI. B. 1.)  Additionally, treatment records also frequently reflect that Plaintiff had full range of

---

[8]    Additionally, to the extent that Dr. Ring concluded that Plaintiff had abilities consistent with medium work, the ALJ gave Plaintiff the benefit of the doubt and found that she should be limited to light work.  (Tr. 24, 25-26, Tr. 393-94); *see Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) ("if a medical opinion adverse to the claimant has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit").

motion in her upper and lower extremities and her neck (Tr. 257, 277, 360, 398, 399), full strength in upper and lower extremities (Tr. 257, 277, 309, 311, 333, 398, 399, 403), normal reflexes and coordination (Tr. 257, 311, 334, 403), and normal muscle bulk and tone. (Tr. 311, 334, 424.)  Although treatment records also report that Plaintiff had some tenderness and pain on examination (Tr. 257, 309, 360, 384, 403, 405), the ALJ rationally concluded that Dr. Ring's opinions were consistent with the medical record and the Court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." *Magallanes*, 881 F.2d at 750; *see Batson*, 359 F.3d at 1198.

Plaintiff asserts that Dr. Ring's notations regarding her daily activities could be read differently to support a finding that, but for her headaches, she was able to do her daily activities. (Doc. 14 at 17-21.)  However, Dr. Ring stated that Plaintiff's "main problem is that she cannot do her primary job which was taking care of people because she cannot help and lift them." (Tr. 351.)  This does not support Plaintiff's current argument that she was primarily limited by headaches.  Even if Dr. Ring's report could be read differently, the ALJ is responsible for resolving any ambiguities in the evidence. *See Rollins*, 261 F.3d at 857.  (although a claimant's testimony about her activities was somewhat equivocal, and the ALJ's interpretation might not have been the only reasonable one, the ALJ's interpretation was reasonable and supported by substantial evidence, and the court would not second-guess it).  Accordingly, the ALJ did not err in assigning great weight to Dr. Ring's opinions, and these opinions constitute substantial evidence in support of the ALJ's disability determination.

### C.    Assessing a Claimant's Credibility

Plaintiff also asserts that the ALJ erred by discrediting her symptom testimony. (Doc. 14 at 17.)  An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Garrison v. Colvin*, 2014 WL 3397218, at *16 n.18 (9th Cir. Jul. 14, 2014) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom.  *Smolen*, 80 F.3d at 1282.  Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected" to produce his pain."  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160–61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her pain or other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms, including pain, limit the claimant's ability to work.  *See* 20 C.F.R. § 404.1529(c)(1).  In making this evaluation, the ALJ may consider the objective medical evidence, the claimant's daily activities, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, precipitating and aggravating factors, medication taken, and treatments for relief of pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

At this second evaluative step, the ALJ may reject a claimant's testimony regarding the severity of her symptoms only if the ALJ "makes a finding of malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and convincing reasons" for finding the claimant not credible.[9]  *Carmickle*, 533 F.3d at 1160

---

[9]  The Ninth Circuit has rejected the Commissioner's argument (Doc. 15 at 9-10) that a lesser standard than "clear and convincing" should apply.  *Garrison*, 759 F.3d at 1015 n.18.

(quoting *Lingenfelter*, 504 F.3d at 1036).   "'The clear and convincing standard is the most demanding required in Social Security Cases.'"   *Garrison*, 2014 WL 3397218, at *15-18 (quoting *Moore v. Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).   Because there was no record evidence of malingering, the ALJ was required to provide clear and convincing reasons for concluding that Plaintiff's subjective complaints were not wholly credible.   Plaintiff argues that the ALJ failed to do so.

**1.      The ALJ's Reasons for Discounting Plaintiff's Subjective Complaints**

**a.      The Objective Medical Evidence**

The ALJ discounted Plaintiff's allegations about the severity of her symptoms and limitations as unsupported by the objective medical record.   (Tr. 24-25.)   The record supports the ALJ's determination.   As the ALJ noted with respect to Plaintiff's back impairment, the objective medical tests did not support Plaintiff's allegations of disabling pain and limitations.   (Tr. 24-25.)   MRIs of Plaintiff's lumbar spine in August and November 2009 were "normal."  (Tr. 303, 304-05.)   A November 2010 MRI of Plaintiff's lumbar spine revealed a cyst lateral to a nerve root that could cause radiculopathy. (Tr. 358, 362-63.)   Based on the 2010 MRI result and Plaintiff's complaints of radiating pain, Dr. Brimhall referred Plaintiff to Dr. Hales for a surgical consultation.   (Tr. 358.) However, Dr. Hales found no evidence of radicular symptoms in either leg.   (Tr. 401.)

As the ALJ noted with respect to Plaintiff's neck and shoulder impairment (Tr. 25-26), MRIs of Plaintiff's neck showed minor degenerative changes, nerve conduction studies were normal, and Dr. Shah found no objective basis to explain Plaintiff's pain. (Tr. 262, 267-68, 364-69, 404, 415-16, 425.)   X-rays of Plaintiff's neck showed "no signs of arthritis or degenerative disc disease.   (Tr. 263.)   Treatment records reflected a full range of motion in Plaintiff's neck (Tr. 360), good shoulder strength (Tr. 360), and no evidence of impingement in her shoulder.   (Tr. 263, 360.)

As to Plaintiff's headaches, the ALJ noted, and the record reflects, that Plaintiff's headaches responded to medication.   (Tr. 25, 309, 384, 403.)   A CT scan of Plaintiff's head showed that her "brain parenchyma [was] normal" and there was "no abnormal

1    enhancement."   (Tr. 293.)   This evidence supports the ALJ conclusion that Plaintiff's

2    symptoms were not as severe as she alleged and would not preclude all work activity.

3          However, the absence of fully corroborative medical evidence cannot form the

4    *sole* basis for rejecting the credibility of a claimant's subjective complaints.  *See Cotton*

5    *v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) (it is legal error for "an ALJ to discredit

6    excess pain testimony solely on the ground that it is not fully corroborated by objective

7    medical findings"), *superseded by statute on other grounds as stated in Bunnell v.*

8    *Sullivan*, 912 F.2d 1149 (9th Cir. 1990); *see also Burch*, 400 F.3d at 681 (explaining that

9    the "lack of medical evidence" can be "a factor" in rejecting credibility, but cannot "form

10   the sole basis"); *Rollins v. Massanari*, 261 F.3d 853, 856-57 (9th Cir. 2001) (same).

11   Thus, absent some other stated legally sufficient reason for discrediting Plaintiff, the

12   ALJ's credibility determination cannot stand.  As discussed below, the ALJ provided

13   additional legally sufficient reasons for discounting Plaintiff's symptom testimony.

### b.    Plaintiff's Daily Activities

15         The ALJ also discounted Plaintiff's allegations that "headaches and pain prevented

16   her from doing just about anything," (Tr. 24) because her daily activities, which included

17   childcare, were not limited.   (Tr. 26.)   Plaintiff asserts that this was not a clear and

18   convincing reason for discrediting her symptom testimony.  (Doc. 14 at 19-21.)

19         The Ninth Circuit has stated that a claimant engaging in normal daily activities

20   "does not in any way detract from [his] credibility as to [his] overall disability."  *Vertigan*

21   *v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).   As the Ninth Circuit has explained,

22   "[o]ne does not need to be 'utterly incapacitated' in order to be disabled."  *Id.* (quoting

23   *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).   Rather, the daily activities must

24   involve skills that could be transferrable to a workplace and a claimant must spend a

25   "substantial part of [her] day" engaged in those activities.  *See Orn v. Astrue*, 495 F.3d

26   625, 639 (9th Cir. 2007) (finding that the ALJ erred in failing to "meet the threshold for

27   transferable work skills, the second ground for using daily activities in credibility

28   determinations.").

The Ninth Circuit has found that the ability to care for a child may be evidence of a claimant's ability to work.  *See Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) ("The ALJ could reasonably conclude that Molina's activities, including walking her two grandchildren to and from school, attending church, shopping, and taking walks, undermined her claims that she was incapable of being around people without suffering debilitating panic attacks."); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (the ALJ properly found that the claimant's claim of totally disabling pain was undermined by her testimony about her activities, such as attending to the needs of her two young children).

In discrediting Plaintiff's symptom testimony, the ALJ noted that Plaintiff's daily activities were not limited.  (Tr. 24.)  The ALJ noted Dr. Ring's finding that Plaintiff could cook, clean, go to the store, carry groceries, and "do anything that she really needs to do on a day-to-day basis."  (Tr. 351.)  Plaintiff had four children (ages fifteen, eleven, nine, and four) and took care of her four-year-old child during the day while her husband worked.  (Tr. 41, 42, 213-14, 397.)  Plaintiff's ability to regularly care for her young child is a legally sufficient reason for rejecting Plaintiff's symptom testimony.  *See Orn*, 495 F.3d at 639 (daily activities, including child care, may be grounds for an adverse credibility"); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (allegations of disability were undermined by activities such as tending to the needs of two young children, cooking, housekeeping, doing laundry, shopping, and attending therapy and various other meetings).

### c.      Receipt of Unemployment Benefits

The ALJ also gave less weight to Plaintiff's symptom testimony based on her administrative hearing testimony that she received unemployment benefits during the time she was alleging disability.  (Tr. 26.)  The receipt of unemployment benefits may undermine a claimant's alleged inability to work full time.  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (citing *Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988)).   This is because unemployment benefit applications may

require that a claimant hold herself out as available for full time work.  *Copeland*, 861 F.2d at 542.  During the administrative hearing, Plaintiff testified that she filed for unemployment benefits.[10]  (Tr. 40.)  However, Plaintiff did not specify whether she held herself out as available for full-time employment.  (*Id.*)  The record that was before the ALJ and the Appeals Council did not contain an unemployment benefits application.  (Doc. 21.)  Thus, even assuming that Plaintiff applied for unemployment benefits, the record does not establish the manner in which Plaintiff held herself out as available for work in completing any such application.  Accordingly, the Court cannot determine that Plaintiff made an assertion regarding her availability for work, and the ALJ's inference on the matter does not constitute a clear and convincing reason for discrediting Plaintiff.  *See Carmickle*, 533 F.3d at 1162; *Ellis v Astrue*, 2011 WL 5025839, at *6 (D. Or. Oct. 20, 2011).  Thus, this basis for the ALJ's credibility determination is not supported by substantial evidence.

## 2. Substantial Evidence Supports the ALJ's Credibility Determination and Any Error Was Harmless

Because the Court concludes that one of the ALJ's reasons supporting her adverse credibility finding is invalid, it must determine whether the ALJ's reliance on this reason to support his credibility determination was harmless error.[11]  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195-97 (9th Cir. 2004) (applying harmless error standard where one of the ALJ's several reasons supporting an adverse credibility finding was held invalid).  If there is "substantial evidence supporting the ALJ's conclusions on . . . credibility" and the error "does not negate the validity of the ALJ's ultimate [credibility] conclusion," the error is deemed harmless.  *Id.* at 1197; *Batson*, 359 F.3d at

---

[10]  To support her claim that the ALJ erred by discounting her credibility based on her receipt of unemployment benefits, Plaintiff has submitted a letter from DES stating that it has no record of Plaintiff applying for unemployment benefits from April 2007 to January 2014.  (Doc. 16.)  The Court addresses this new evidence in Section VI.D below.

[11]  The ALJ also discounted Plaintiff's credibility because she received a conservative course of treatment.  (Tr. 26.)  Plaintiff does not challenge this basis for the ALJ's credibility determination.  (Doc. 14.)

1197 (concluding that the ALJ erred in relying on one of several reasons in support of an adverse credibility determination, but finding that such error did not affect the ALJ's decision, and therefore was harmless, because the ALJ's remaining reasoning and ultimate credibility determination were supported by substantial evidence in the record).

Here, the ALJ's decision finding Plaintiff less than fully credible is valid, despite the error identified above.  To the extent the ALJ found Plaintiff not fully credible, substantial evidence in the record supports that determination.  Plaintiff testified that she cared for her young daughter while her husband worked, and the objective medical record contradicted Plaintiff's assertions about disabling limitations.  (*See* Section II.A.)  On this record, the ALJ's error in relying on Plaintiff's apparent receipt of unemployment benefits does not "negate the validity" of the ALJ's adverse credibility finding.  *Batson*, 359 F.3d at 1197.  The remaining valid reasons supporting the ALJ's determination demonstrate that to the extent the ALJ found that Plaintiff's testimony was not credible, the ALJ did not do so arbitrarily.  *Rollins*, 261 F.3d at 856-57.

### D.    Sentence Six Remand

To further support her claim that the ALJ erred in discounting her symptom testimony, Plaintiff has submitted a letter from DES stating that its records do not show that Plaintiff applied for unemployment from April 1, 2007 through January 8, 2014. (Doc.16.)  Plaintiff did not present this evidence to the ALJ or to the Appeals Council. She asks the Court to consider this evidence in this proceeding.  (Doc. 14 at 8-11.)

On review of the Commissioner's decision, the Court may consider evidence that was presented to the ALJ.  The Court may also consider evidence that was not previously presented to the ALJ, but that was submitted to and considered by the Appeals Council. *See Taylor v. Comm'r Soc. Sec.*, 659 F.3d 1228, 1232 (9th Cir. 2011.)  However, the Court may not consider evidence that was not presented at all.  Rather, when a claimant has new evidence that she did not present to the ALJ or to the Appeals Council, the appropriate procedure is to request a remand under sentence six of § 405(b) to allow the

1   agency to consider the evidence not presented previously.  Liberally construing Plaintiff's

2   arguments, she seeks a remand for consideration of DES's letter.

3      Under sentence six, the Court may remand the case without ruling on the merits

4   when "new, material evidence is adduced that was for good cause not presented before

5   the agency."  *Shalala v. Schaefer*, 509 U.S. 292, 297 n.2 (1993) (citing *Melkonyan v.*

6   *Sullivan*, 501 U.S. 89, 100 (1991)).   To be material, "the new evidence must bear

7   'directly and substantially on the matter in dispute.'"  *Mayes v. Massanari*, 276 F.3d 453,

8   461-62 (9th Cir. 2001) (citation omitted).  The claimant must "demonstrate that there is a

9   'reasonable probability' that the new evidence would have changed the outcome of the

10  administrative hearing."  *Id.* (citation omitted).   To demonstrate good cause, "the

11  claimant must demonstrate that the new evidence was unavailable earlier."  *Id.* (citation

12  omitted).   "If new information surfaces after the Secretary's final decision and the

13  claimant could not have obtained that evidence at the time of the administrative

14  proceeding, the good cause requirement is satisfied."  *Key v. Heckler*, 754 F.2d 1545,

15  1551 (9th Cir. 1985) (citation omitted).    This requirement is not met by seeking more

16  favorable evidence after benefits are denied.  *Mayes,* 276 F.3d at 462-63.  (good cause

17  was not shown when claimant complained of back problems during hearing but did not

18  pursue a diagnosis or treatment during claimed period of disability).

19     The Court first considers whether Plaintiff has shown good cause.  Plaintiff argues

20  that she satisfies the good cause requirement because she was confused during the

21  administrative hearing when the ALJ asked whether she had applied for unemployment

22  benefits.  (Doc. 14 at 9.)  She asserts that she confused unemployment benefits with

23  workers compensation.  (*Id.*)  Plaintiff further argues that she was represented by counsel

24  during the administrative hearing, and he did nothing to clear up the misunderstanding.

25  Plaintiff argues that she relied on her attorney to adequately represent her during the

26  administrative proceedings and he did not.  (Doc. 19 at 13.)  Plaintiff asserts that she has

27  a limited education and did not realize she had received inadequate representation until

28  after the Appeals Council issued its decision.  (*Id.*)  Plaintiff, however, does not explain

1   why she did not realize until after the administrative proceedings were over that she had

2   mistakenly testified that she applied for unemployment benefits.

3          Plaintiff has not met the good cause standard.  During the administrative hearing,

4   Plaintiff testified that she applied for unemployment benefits.  Plaintiff does not argue

5   that she informed counsel at any time during the administrative proceedings that she had

6   not applied for such benefits, or that she was confused about whether she had done so.

7   Evidence that Plaintiff had not applied for unemployment benefits during the relevant

8   period was available from DES at the time of the administrative proceedings and Plaintiff

9   has not shown good cause for failing to obtain that information during the relevant

10  period.

11         Additionally, Plaintiff has not shown that evidence that she did not apply for

12  unemployment benefits between April to January 2007 is material.  Even assuming that

13  the evidence clearly established that Plaintiff did not file for unemployment benefits after

14  she stopped work, which the Commissioner disputes (Doc. 15 at 20), Plaintiff has not

15  shown a reasonable probability that the new evidence would have changed the outcome

16  of the administrative proceeding.  *See Mayes*, 276 F.3d at 61-62.  The ALJ gave several

17  reasons to support her adverse credibility determination.  (Tr. 25-26.)  The ALJ also

18  stated that, although Plaintiff's receipt of unemployment benefits cast doubt on her

19  credibility, it was "not dispositive of the question of the claimant's disability."  (Tr. at

20  26.)  Accordingly, Plaintiff has not met the standard for a sentence six remand.

21         **E.      Prejudging Plaintiff's Claim and Failure to Develop the Record**

22         Plaintiff also suggests that the ALJ prejudged her claims and failed to develop the

23  record.  (Doc. 14 at 11.)  These arguments do not provide a basis for relief in this case or

24  establish a due process violation.  Plaintiff does not specifically allege a denial of due

25  process.  (Doc. 14.)  However, because Plaintiff is pro se, the Court liberally construes

26  her filings and determines whether her assertion that the ALJ prejudged her claim

27  establishes a due process violation.  A claimant's allegation that the ALJ "prejudged [a]

28  case in some way" is not sufficient to show a violation of due process.  *Valentine v.*

*Comm'r Soc. Sec.*, 574 F.3d 685, 690 (9th Cir. 2009).  ALJs are presumed to be unbiased, and such presumption can only be rebutted by a showing of conflict of interest or some other specific reason for disqualification.  *Id.*  "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women sometimes display, do not establish bias." *Id.*  (citation omitted). Plaintiff has not presented any evidence to rebut the "presumption of honesty and integrity in those serving as [administrative] adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

Similarly, Plaintiff has not shown that the ALJ failed to develop the record regarding her receipt of unemployment benefits or her headaches.  First, Plaintiff asserts that her testimony regarding the receipt of unemployment benefits was "obviously confused."  (Doc. 14 at 10.)  However, despite being given the opportunity to do so, Plaintiff's attorney did not ask any follow-up questions at the administrative hearing. (Tr. 35-49.)  Although the record of the administrative hearing suggests that Plaintiff might have had some uncertainty about whether she applied for unemployment benefits (Tr. 40 (stating that "it's been so long ago I can't remember if I [applied for unemployment benefits] or not.")), the ALJ was not obligated to further develop the record on that issue because, after indicating that she could not recall whether she had applied for unemployment benefits, Plaintiff responded that she was "sure [she] did." (Tr. 40.)

Additionally, Plaintiff has not shown that the ALJ erred by failing to develop the record about Plaintiff's headaches relevant to determining whether they satisfied a listed impairment.  Plaintiff's counsel did not present a listing argument either to ALJ or the Appeals Council.  (Tr. 35-49, 246-47.)  Thus, the ALJ was not required to consider whether Plaintiff's impairments met or equaled a listed impairment.  *See Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) ("An ALJ is not required to discuss the combined effects of a claimant's impairment or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish

equivalence."); *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004) (when a claimant is represented by counsel, the ALJ should ordinarily rely on the claimant's counsel to structure and present the claimant's case in a way that the claimant's claims are adequately explored).

Moreover, as discussed in Section VI.A, the record contained evidence related to Plaintiff's headaches.  The ALJ considered the evidence and formulated an RFC that accounted for Plaintiff's headaches by finding that she should avoid concentrated exposure to noise and vibration.  (Tr. 24.)  As discussed in section VI.A, any error in failing to consider whether Plaintiff's headaches met or equaled a listed impairment was harmless.

**VII.  Conclusion**

As set forth above, the ALJ's opinion is supported by substantial evidence in the record and is free of harmful legal error.

Accordingly,

**IT IS ORDERED** that the Commissioner's disability determination is **AFFIRMED**.  The Clerk of Court is directed to enter judgment in favor of the Commissioner and against Plaintiff and to terminate this action.

Dated this 16th day of December, 2014.


_____
Bridget S. Bade
United States Magistrate Judge